IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAIʻI

| | |
|---|---|
| KPRS HAWAII CONSTRUCTION, INC., | Civil No. 24-00106 MWJS-KJM |
| Plaintiff/Counterclaim Defendant, | ORDER DENYING COUNTERCLAIM DEFENDANT KPRS' MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 73] AND DENYING DEFENDANT BIE'S MOTION FOR PARTIAL SUMMARY JUDGMENT [DKT. NO. 77] |
| vs. | |
| BIG ISLAND ELECTRIC, INC., | |
| Defendant/Counterclaimant. | |

**INTRODUCTION**

In early 2022, KPRS Hawaii Construction, Inc. (KPRS) and Big Island Electric, Inc. (BIE) agreed that BIE would perform electrical work on a large construction project KPRS was overseeing on Hawaiʻi Island. To that end, they inked a subcontract agreement that outlined the scope of the work BIE would perform and the compensation it would receive, established a schedule for the work to be completed, and provided procedures for KPRS to terminate the contract either for cause or convenience. By the latter half of 2023, though, the relationship had fallen apart, and this litigation followed: KPRS sued BIE, and BIE responded with a counterclaim against KPRS.

Now, in advance of trial, the parties have filed cross-motions for partial summary judgment, each contending they should prevail on certain claims as a matter

of law.  Because the court concludes that there are genuine disputes of material fact that must be resolved at trial, the motions are DENIED.

## BACKGROUND

### A.    Factual Background

#### 1.    KPRS and BIE Enter into a Contractual Relationship

There is no dispute that on January 20, 2022, KPRS and BIE entered into a Subcontract Agreement under which BIE agreed to perform electrical work on a project involving the construction of a 10,000 square foot building known as the "Kona Farm Coffee and Distillery."  *See* Dkt. No. 78, at PageID.740 (BIE's Concise Statement of Facts (CSF) at ¶ 1); *see also* Dkt. No. 85, at PageID.1072 (KPRS' Response to BIE's CSF at ¶ 1) ("Admit").  The Subcontract Agreement lists KPRS as the general contractor and BIE as the subcontractor.  It calls for KPRS to pay BIE $2,468,952 for "satisfactory performance" of the agreed-upon work.  Dkt. No. 78-3, at PageID.751 (Ex. A to BIE's CSF).  It defines the "scope of work," sets a "schedule of work," and emphasizes that "[t]ime is of the essence."  *Id.* (capitalizations omitted).  And it includes, as Exhibit A to the Subcontract Agreement, a separate Subcontract Master Agreement.  *Id.* at PageID.794–831.

That Subcontract Master Agreement, in turn, authorized KPRS to terminate the contract in either of two ways:

First, § GC-42 of the Subcontract Master Agreement authorized KPRS to terminate the contract "for default."  Under this provision, BIE would be "considered in

2

default of its contractual obligations" if, among other things, it were to "[a]bandon[] or refuse[] to proceed with any of the [w]ork" or "[f]ail[] to fulfill or comply with any of the terms" of the agreement.  Dkt. No. 78-3, at PageID.814.  And if KPRS wished to "terminate the SUBCONTRACT for [such] default," KPRS would have to "notify" BIE "in writing of the nature of the failure" and of KPRS' "intention to terminate" the agreement "for default."  *Id.*  If, after seven "calendar days from receipt of notification," BIE did not "cure of [sic] such failure," then KPRS could through further "written notice" to BIE, "terminate in whole or in part" BIE's "right to proceed with the [w]ork." *Id.* at PageID.814–15.  Once this further notice was provided, BIE would be required to, among other things, "[i]mmediately discontinue work on the date and to the extent specified in the notice."  *Id.* at PageID.815.

Second, § GC-43 of the Subcontract Master Agreement authorized KPRS to "terminate for convenience any of the [w]ork under this SUBCONTRACT, in whole or, from time to time, in part, at any time by written notice" to BIE.  *Id.*  To rely on this provision, KPRS' "written notice" would have to "specify the extent to which the performance of the [w]ork is terminated and the effective date of such termination."  *Id.* And here again, "[u]pon receipt of such notice," BIE would be required to, among other things, "[i]mmediately discontinue the [w]ork on the date and to the extent specified in the notice."  *Id.*

## 2.    The Contractual Relationship Breaks Down

There also is no dispute that by the second half of 2023, the relationship between KPRS and BIE had broken down.  But the parties do not agree on much else.

As BIE sees it, "[i]n October 2023, KPRS demanded that BIE stop work and arbitrarily ordered BIE to vacate the construction project without a single written notice or opportunity to cure."  Dkt. No. 77-1, at PageID.714.  And while BIE recognizes that the Subcontract Master Agreement authorized KPRS to terminate the agreement for default or for convenience, BIE contends that KPRS did neither—because it failed to provide adequate written notice identifying problems that might be cured, failed to give a seven-day waiting period for possible cure, and failed to provide written notice that KPRS was indeed exercising its right to terminate the agreement, let alone identifying the effective date of any such termination.

KPRS, for its part, alleges that "it was immediately apparent that there were problems" from the moment BIE "began work on the Project" in late 2022.  Dkt. No. 1, at PageID.4.  KPRS represents that in August 2023, the owner of the construction project visited the site and "was amazed at how little progress had been made on [the] scope of work" that BIE had contracted to perform.  Dkt. No. 86, at PageID.1282.  And yet, according to KPRS, "BIE was submitting invoices demanding payment for 90% of its work."  *Id.*  When KPRS informed BIE that "no more payments would be made until BIE caught up with its work so that it would reflect the payment applications, and that

4

BIE needed to staff more people on the job to achieve that goal," a BIE representative "defiantly asserted he had no more men to put on the job and that KPRS could do whatever it wanted, including firing BIE." *Id.* at PageID.1282–83.

And so, according to KPRS, on September 29, 2023, BIE sent a formal letter to KPRS, "reiterating that if BIE did not receive payment for its disputed invoices, BIE would demobilize from the Project." *Id.* at PageID.1283. The "subject of the letter was 'Notice of intent . . . to terminate contract.'" *Id.* at PageID.1283–84. In KPRS' view, its correspondence to BIE in October 2023 was not itself an exercise of KPRS' right to terminate the contract, but instead merely an "acknowledgement in writing of BIE's repudiation of the Subcontract." *Id.* at PageID.1284.

### B.    Procedural History

#### 1.    KPRS' Complaint

KPRS initiated this lawsuit in March 2024. Dkt. No. 1. The complaint advances seven counts:

Count I asserts a breach of contract, alleging that BIE failed to perform its contractual obligations and that KPRS suffered damages as a result. *Id.* at PageID.11 (¶¶ 29–33).

Count II is a claim of anticipatory repudiation, in which KPRS alleges that BIE "anticipatorily repudiated the contract through its many communications to KPRS that

it was unable and unwilling to complete its contractual obligations." *Id.* at PageID.12

(¶¶ 34–40).

Count III raises a claim of unjust enrichment; according to KPRS, it "conferred

significant benefits" upon BIE by "paying" BIE monies to "purchase equipment and

materials to be used on the Project," which BIE did not use for those ends. *Id.* at

PageID.13 (¶¶ 41–46). Count IV, meanwhile, alleges conversion based on similar

allegations. *Id.* at PageID.13–14 (¶¶ 47–54).

Count V alleges that BIE "made certain representations to KPRS in connection

with the Project," despite "kn[owing] at the time it made those representations that they

were false." *Id.* at PageID.14–15 (¶¶ 55–59).

Finally, Counts VI and VII request a declaratory judgment and specific

performance. *Id.* at PageID.15–16 (¶¶ 60–64).

### 2. BIE's Counterclaim

In April 2024, BIE filed its answer to KPRS' complaint, Dkt. No. 13, and

separately filed a counterclaim against KPRS, Dkt. No. 13-1.[1] In the caption of its

counterclaim document, BIE labeled itself the "Counterclaimant" and labeled KPRS the

"Counterclaim Defendant." *Id.* at PageID.43–44.

---

[1]     The latter document also included a third-party complaint against Third-Party
Defendant Fidelity and Deposit Company of Maryland, which concerns a mechanic's
lien discharge bond; that third-party complaint has no bearing on the issues raised in
the current motions, and the court therefore will not describe it further.

In its counterclaim, BIE asserts two counts against KPRS.  Count I asserts that KPRS breached the Subcontract Agreement "by failing to timely pay BIE the amounts due and owing to BIE under the Subcontract Agreement."  *Id.* at PageID.48 (¶¶19–22). Count II presents a claim of unjust enrichment, alleging that "BIE conferred benefits upon KPRS by providing materials and labor at KPRS' direction and request," that "BIE conferred these benefits with the reasonable expectation that KPRS would compensate BIE for such benefits," and that it "would be unjust for KPRS to retain the benefits conferred by BIE without compensation to BIE."  *Id.* at PageID.48–49 (¶¶ 23–27).

### 3.    The Scheduling Orders and the Expert Disclosures

The parties have, since early in the case, had the benefit of scheduling orders that set deadlines for expert disclosures.  These scheduling orders used the template language regularly used to set these expert disclosure deadlines in civil litigation in this district.  No counsel ever asked for any clarification about the expert disclosure deadlines.

The first scheduling order was issued on July 19, 2024, when the court—using standard district template language—required each party to make "disclosures regarding expert witnesses" according to the following schedule:  "All plaintiffs shall comply by February 18, 2025," and "All defendants shall comply by April 21, 2025." Dkt. No. 31, at PageID.145.  The court also authorized "[r]ebuttal disclosures to a

witness identified by another party," so long as those disclosures were made within thirty days "after disclosure by the other party." *Id.*

The court amended the scheduling order on April 15, 2025, once again retaining standard template district language: while the court noted that the deadline for "All plaintiffs" to make disclosures regarding expert witnesses had closed, it set the deadline for "All defendants" to make expert disclosures by October 17, 2025. Dkt. No. 43, at PageID.185.

On October 22, 2025, the court endorsed the parties' stipulation to "extend the deadline for BIE to submit its expert disclosures in this matter for three weeks from October 17, 2025 to November 7, 2025," and to allow KPRS to file a rebuttal report "by December 8, 2025." Dkt. No. 59, at PageID.233. Given that the deadline for "All plaintiffs" to make expert disclosures had already closed, and given that the October 17, 2025, deadline only concerned disclosures by "All defendants," it followed that the court was only extending the deadline for BIE's expert disclosures in its role as "defendant[]."

BIE nonetheless disclosed, on November 7, 2025, an expert that it sought to use, not only to support its defense against KPRS' claims, but also to prove affirmative counterclaims of delay damages (claims that had not been explicitly alleged in BIE's counterclaim). *See* Dkt. No. 66. This meant that, rather than having an opportunity to

8

make its own "defendant[]" expert disclosure in response to this counterclaim, KPRS was limited to filing a rebuttal expert disclosure.

### 4.    The Cross-Motions for Summary Judgment

The parties have now filed cross-motions for summary judgment. KPRS' motion seeks partial summary judgment solely on BIE's affirmative claims of delay damages. KPRS contends that BIE failed to timely disclose the expert witness on which it seeks to rely for its affirmative claims of delay damages, that the expert should therefore be excluded, and that BIE cannot meet its burden on that claim without an expert. Dkt. Nos. 73 and 74. BIE filed an opposition to KPRS' motion, Dkt. Nos. 83 and 84, and KPRS filed a reply in further support, Dkt. No. 87.

BIE's cross-motion seeks summary judgment on Counts I, II, and VI of KPRS' complaint. BIE's argument is that KPRS terminated the Subcontract Agreement without following the termination procedures laid out in the agreement (and therefore breached the contract), that the court should reach this conclusion as a matter of law, and that KPRS cannot obtain damages on any of its contract claims because of its own breach. Dkt. Nos. 77 and 78. KPRS filed an opposition in which it argues that it did not have to follow the termination procedures because BIE committed an anticipatory repudiation of the contract. Dkt. Nos. 85 and 86. And, while it did not make this argument in its own motion for partial summary judgment, KPRS here argues that the court should find anticipatory repudiation as a matter of law. BIE filed a response in further support

9

of its motion and in opposition to KPRS' belated request for summary judgment on
anticipatory repudiation.  Dkt. Nos. 88 and 89.

The court scheduled a hearing on these motions on February 20, 2026, but after
carefully reviewing the parties' written submissions, concludes that the motions are
suitable for disposition without a hearing as authorized by Local Rule 7.1(c).

## SUMMARY JUDGMENT STANDARD

Summary judgment is only appropriate when a movant shows there is no
genuine dispute as to any material fact, and the movant is entitled to judgment as a
matter of law.  Fed. R. Civ. P. 56(a).  The question is "whether the evidence presents a
sufficient disagreement to require submission to a [trier of fact] or whether it is so one-
sided that one party must prevail as a matter of law."  *Anderson v. Liberty Lobby, Inc.*, 477
U.S. 242, 251–52 (1986).

The party seeking summary judgment bears the initial burden of demonstrating
the absence of any genuine disputes of material fact.  *Celotex Corp. v. Catrett*, 477 U.S.
317, 323 (1986).  If the moving party makes that showing, the burden then shifts to the
nonmoving party to "come forward with specific facts showing that there is a genuine
issue for trial."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)
(cleaned up).  In assessing whether a genuine issue exists, the court must draw all
reasonable inferences in favor of the non-moving party.  *Matsushita Elec.*, 475 U.S. at 587;
*see also Barnes v. Sea Hawaii Rafting, LLC*, 889 F.3d 517, 538 (9th Cir. 2018).

10

## DISCUSSION

### A.    KPRS' Motion for Partial Summary Judgment

KPRS moves for partial summary judgment on BIE's affirmative delay damages claims.  The premise of KPRS' motion is that BIE violated the court's scheduling orders by failing to make timely expert disclosures in support of its affirmative claims of delay damages.  Although the disclosures met the deadline set for "[a]ll defendants," KPRS points out that "[a]ll plaintiffs" were required to produce expert reports several months earlier.  And KPRS contends that in its role as counterclaimant, BIE was a "plaintiff" within the meaning of the orders.

KPRS' interpretation of the orders is sound.  The most natural and commonsense reading of their language is that the party bringing a claim will make an expert disclosure first (with the other party allowed to make a rebuttal disclosure).  And then, after some period of discovery practice, the party defending against the claim is allowed the opportunity to disclose a defensive expert of their own (with the other party again allowed to make a rebuttal disclosure).  This reading of the orders is supported not only by the most logical practical operation of pretrial procedure, but also by the "well established" principle that "a counterclaim results in shifting the parties so that the party counterclaiming becomes the plaintiff on the counterclaim and the original plaintiff becomes the defendant."  *Polimaster Ltd. v. RAE Sys., Inc.*, 623 F.3d 832, 839 (9th

11

Cir. 2010) (holding that the term "defendant" in an arbitration agreement

unambiguously included a counterclaim defendant).

It follows that BIE did indeed violate this court's scheduling orders by waiting

until the "defendants" deadline to make expert disclosures in support of its affirmative

delay damages claims. But that conclusion alone does not warrant summary judgment.

A district court "has wide discretion in controlling discovery and that discretion is

particularly wide in deciding whether to exclude witnesses." *V5 Techs. v. Switch, Ltd.*,

334 F.R.D. 615, 617 (D. Nev. 2020) (cleaned up). Courts "do not construe the duty to

provide witness disclosures in a manner that puts form over substance," and the key

question is whether the opposing party has been "put on notice of the factual and legal

contentions of the opposing party." *Id.* The court need not exclude a witness if the

violation of a court's scheduling order is either harmless or substantially justified. *See*

Fed. R. Civ. P. 37(c)(1).[2]

BIE has not shown any substantial justification. To be sure, BIE notes that the

court's scheduling orders never explicitly identify BIE as a "plaintiff," and that the

---

[2]     KPRS makes mention of the fact that BIE did not amend its counterclaim to add
an affirmative claim of delay damages, but it does not distinctly argue that exclusion
should follow from that pleading omission standing alone. And for good reason:
"under Federal Rule of Civil Procedure 54(c), . . . the district court may grant any relief
to which the evidence shows a party is entitled, even though the party has failed to
request the appropriate remedy or remedies in his pleading.'" *Scarlett Honolulu, Inc. v.
Honolulu Liquor Comm.*, Civil No. 21-00457, 2024 WL 4224861, at *4 (D. Haw. Sept. 17,
2024) (quoting 5 Charles Alan Wright & Arther R. Miller, *Federal Practice and Procedure*
§ 1255 (4th ed. June 2024 Update)).

caption of the orders instead refer to BIE as "Defendant." Nor do the scheduling orders

explicitly say that in its role as counterclaimant, BIE qualifies as a "plaintiff" for

purposes of the expert disclosure deadline. In light of this ambiguity, the court cannot

say that BIE's proffered interpretation of the language is entirely unsupportable or

frivolous.[3] *Accord Polimaster*, 623 F.3d at 844–47 (Clifton, J., dissenting) (rejecting the

panel majority's conclusion and reasoning that an arbitration agreement's use of

"defendant" did not unambiguously cover a counterclaim defendant).

But it is one thing for BIE to identify a plausible alternative reading of the orders,

and quite another to show that it was substantially justified in relying on its reading.

BIE cannot do the latter. After all, it is well understood within the Ninth Circuit—or at

least it has been since *Polimaster* was decided in 2010—that "the party counterclaiming

becomes the plaintiff on the counterclaim." 623 F.3d at 839. And while the scheduling

orders never identified BIE as "plaintiff" or KPRS as "defendant" on BIE's counterclaim,

BIE went at least half of the way toward doing so itself: in the caption of its

counterclaim document, BIE labeled KPRS the "Counterclaim Defendant." Dkt. No. 13-

1, at PageID.43–44. Given these circumstances, therefore, BIE's counsel at a minimum

should have conferred with opposing counsel or sought guidance from the court before

---

[3]     For that reason, the U.S. Magistrate Judges in this District, who typically issue
these scheduling orders, will be discussing whether there might be a way to reduce any
ambiguity in the template's standard language.

relying on a plausible—but strained—reading of the court's orders.  Because they failed

to do so, the court cannot conclude BIE's conduct was substantially justified.

Nonetheless, the court does conclude that BIE's conduct was harmless.  Trial is

still several months away, and so while discovery has already closed, the court could

readily reopen discovery (and even continue the trial date) if KRPS were to identify any

ways in which it truly needed to conduct additional discovery to adequately scrutinize

BIE's untimely expert disclosures.  It is also significant that, while KPRS' motion papers

assert that KPRS has been harmed by the untimely delay, they do not identify any

concrete way in which that might be true.  KPRS has already engaged in some

discovery practice concerning BIE's expert, and it noticed a deposition of that expert.

*See* Dkt. No. 76.  Under these circumstances, the sanction of excluding BIE's expert

witnesses is not appropriate.

And that means summary judgment is not appropriate.  KPRS' only argument

for partial summary judgment on the affirmative delay damages claims is that, without

its proposed expert testimony, BIE cannot meet its burden on those claims.  Because the

court has rejected KPRS' arguments for excluding the expert testimony, KPRS' request

for summary judgment must be rejected as well.

### B.    BIE's Motion for Summary Judgment

BIE seeks summary judgment on three of KPRS' claims.  As was the case with

KPRS' motion, BIE's motion rests on a single premise:  that KPRS failed to comply with

14

the termination procedures in the Subcontract Master Agreement as a matter of law.

From that premise, BIE argues for two conclusions: that KPRS breached the contract,

and that its breaches preclude it from seeking contractual relief.

KPRS does not seriously dispute BIE's premise, at least for purposes of this

summary judgment proceeding. Nor does it dispute that if KPRS did itself breach the

contract, then it cannot recover for a counterparty's breach. And for good reason:

Hawaiʻi state law (which all parties agree controls the substantive legal issues in this

diversity jurisdiction case) provides that "as a general rule, 'a party cannot recover for a

breach of contract if he fails to comply with the contract himself.'" *Accord PR Pension

Fund v. Nakada*, 8 Haw. App. 480, 491, 809 P.2d 1139, 1146 (Haw. Ct. App. 1991) (quoting

17A Am. Jur. 2d *Contracts* § 617, at 625 (1991)).

Instead, KPRS denies that it breached the contract. According to KPRS, it did not

have to rely on the contract's termination procedures, because BIE itself effectively

terminated the contract through its anticipatory repudiation. If that is so, KPRS

continues, then its alleged failure to follow termination procedures cannot amount to a

breach of the contract, since BIE's own conduct had already served to end the

contractual relationship. And if KPRS did not breach the contract, then it is not barred

from seeking relief.

As a threshold matter, KPRS is correct that Hawaiʻi state law recognizes the

doctrine of anticipatory repudiation. Under this doctrine, an anticipatory repudiation

15

"occurs when a party communicates definite renunciation of future performance under the contract." *Langer v. Rice*, No. 29636, 2013 WL 5788676, at *15 (Haw. Ct. App. Oct. 28, 2013) (citing *Romig v. deVallance*, 2 Haw. App. 597, 605, 637 P.2d 1147, 1152–53 (Haw. Ct. App. 1981)); *accord* 13 *Williston on Contracts* § 39:37 (4th ed. May 2025 Update) (explaining that "the repudiating party must have communicated, by word or conduct, unequivocally, unconditionally, and positively, its intention not to perform"). But a court will not find a repudiation "by a mere breach of contract not so substantial and fundamental as to defeat the object of the parties in making the agreement." *Golf Carts, Inc. v. Mid-Pac. Country Club*, 53 Haw. 357, 359, 493 P.2d 1338, 1339 (Haw. 1972) (cleaned up). And so to qualify as an anticipatory repudiation, a party's announced refusal to perform "must go to the root of the contract" or "must be in respect of matters which would render the performance of the remainder a thing different in substance from that which was contracted for." *Id.*

KPRS argues that BIE's anticipatory repudiation is so obvious and incontrovertible that it should be found as a matter of law. On this the court disagrees. "Whether a party to a contract committed an anticipatory repudiation is generally a question of fact." *Peck v. Nakkim*, No. 29480, 2013 WL 6762359, at *9 (Haw. Ct. App. Dec. 20, 2013). And KPRS' argument for anticipatory repudiation raises matters of credibility and inferences that cannot be resolved in its favor at the summary judgment stage.

16

But the existence of genuine disputes of material fact on anticipatory repudiation also precludes summary judgment in BIE's favor. That is because, as a matter of law, if BIE did indeed commit an anticipatory repudiation, then KPRS would not have needed to exercise its contractual termination rights before bringing this lawsuit. "Under the doctrine of anticipatory repudiation, a plaintiff acquires the elective right to sue when the other party repudiates the contract." *Langer*, 2013 WL 5788676, at *13. BIE's anticipatory repudiation would, therefore, have entitled KPRS to bring suit without needing to terminate the contract of its own volition.

BIE resists this conclusion, but it does not offer any argument that would warrant a different result. BIE principally contends that KPRS should be judicially estopped from denying that it terminated the contract because it has already admitted to having done as much. Dkt. No. 88, at PageID.1329–31. That may well be, but it does not advance BIE's position here. If a jury finds that BIE committed anticipatory repudiation, then KPRS was entitled to sue. The fact that KPRS might have attempted (perhaps unsuccessfully) to invoke its contractual termination rights *after* the anticipatory breach need not, as a matter of logic, mean that it lost the right to sue *because* of the anticipatory breach. It is entirely sensible that a party faced with an anticipatory repudiation might—in an effort to shore up their position for eventual litigation—also attempt to invoke contractual termination procedures, and perhaps also encourage its counterparty to simply walk away. "That some wear a belt and

17

suspenders does not prove the inadequacy of either to hold up the pants, but only the

cautious nature of the person wearing the pants." *United States v. Carona*, 660 F.3d 360,

369 (9th Cir. 2011) (cleaned up).

BIE alternatively argues that, as a matter of contract interpretation, the

Subcontract Master Agreement's termination provisions should be interpreted as

preempting or removing KPRS' right to sue in the face of an anticipatory repudiation.

*See* Dkt. No. 77-1, at PageID.729–31.  That is, BIE's contention here is that KPRS did not

have the option of donning both a belt and suspenders, as the contract eliminated one of

those options.  But while it is true, as BIE says, that "parties are free to agree to

contractual conditions on a party's ability to assert anticipatory repudiation relating to

obligations arising from the subject contract," *id.* at PageID.731, BIE has not identified

any language in the Subcontract Master Agreement that can be fairly construed as

having done so here.  Indeed, BIE points to no place in the agreement where the phrase

"anticipatory repudiation" is even mentioned.

To be sure, § GC-42 authorizes KPRS to terminate for cause if BIE ever were to

"[a]bandon[] or refuse[] to proceed with any of the [w]ork" or "[f]ail[] to fulfill or

comply with any of the terms" of the agreement.  Dkt. No. 78-3, at PageID.814.  BIE

contends that this language amounts to an "agree[ment] to an express contractual

provision applicable to situations where KPRS contends that BIE anticipatorily

repudiated the contract."  Dkt. No. 77-1, at PageID.732.  But it is not fairly read that

18

way; the language of § GC-42 nowhere mentions anticipatory repudiation and does not remotely track any substantive standard for default consistent with anticipatory repudiation. It instead sweeps far more broadly. Under § GC-42, KPRS could have terminated for cause based on BIE's refusal to "proceed with *any* of the [w]ork," regardless of how substantial the work at issue might be in relation to the overall construction project, and regardless of how unequivocal and unconditional the refusal might be.

And while BIE contends, unpersuasively, that § GC-42 tracks the doctrine of anticipatory repudiation, it does not attempt to defend the broader and more startling suggestion that a party who negotiates for a broad termination right in a contract must be viewed as having surrendered any narrower common law right to sue. After all, under the Subcontract Master Agreement, KPRS could also terminate the agreement under § GC-43 simply for its own convenience. The broad language of § GC-43 surely covers anticipatory repudiation—after all, it would be convenient for a party to terminate a contract in the face of an anticipatory repudiation—but even BIE does not suggest that the breadth of this contractual language means that KPRS has implicitly surrendered its narrower common law rights.

Nor does the fact that § GC-42 and § GC-43 provide procedural protections for BIE support an inference that those same procedural protections ought to apply in the case of anticipatory repudiation. It makes sense that the contracting parties would pair

the broad contractual termination rights with procedural protections, so that BIE would be entitled to clear notice before KPRS could invoke termination rights that would contractually require BIE to stop work on the project. But KPRS' broad termination rights do not imply that KPRS meant to give up its independent common law right to sue if BIE ever took it upon itself to repudiate the contract and refuse to work on the project. At the least, BIE has not offered any argument to support that implication.

In the end, the Subcontract Master Agreement is most naturally read to equip KPRS with the broad right under § GC-42 and § GC-43 to terminate the contract so long as it followed certain procedural requirements—rights that it would not have possessed if it had not bargained for them in the contract. At the same time, the contract is not fairly read to require KPRS to adhere to those procedural requirements even in the unusual event of an anticipatory repudiation by BIE. *See generally* 13 *Williston on Contracts* § 39:37 (4th ed. May 2025 Update) (explaining that "following a clear repudiation, the other party should not be required to perform the formal, economically wasteful, useless act of performing further").[4]

_____

[4]    To be sure, in the face of an alleged anticipatory repudiation, a party might choose not to sue and instead to continue accepting the benefits of the contractual relationship. Behavior of that sort might result in the forfeiture of a right to sue based on the anticipatory repudiation. But BIE does not here suggest that KPRS sat back and took no action after the breakdown in their relationship; in a series of communications between the parties, KPRS plainly expressed its understanding that the relationship had come to an end, even if (as BIE alleges) it did not adequately comply with the particular requirements of the Subcontract Master Agreement's termination provisions.

The upshot is that a jury must resolve whether BIE committed an anticipatory breach.  If the jury finds that BIE did not do so, then BIE will be free to persuade the jury that KPRS breached the contract itself by failing to properly follow the termination provisions.  But these are questions for the jury to resolve at trial, not for the court to resolve at summary judgment.

## <u>CONCLUSION</u>

For the foregoing reasons, the cross-motions for partial summary judgment are each DENIED.

IT IS SO ORDERED.

DATED:  January 28, 2026, at Honolulu, Hawai'i.



/s/ Micah W.J. Smith

_____
Micah W.J. Smith
United States District Judge

Civil No. 24-00106 MWJS-KJM; *KPRS Hawaii Construction, Inc. v. Big Island Electric, Inc.*;
ORDER DENYING COUNTERCLAIM DEFENDANT'S MOTION FOR PARTIAL
SUMMARY JUDGMENT AND DENYING DEFENDANT BIE'S MOTION FOR
PARTIAL SUMMARY JUDGMENT